AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Sky Devices Cellphone<br>IMEI: 352083110405040 | )<br>)<br>)  Case No.   20MJ4268<br>)<br>)<br>) |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the   Southern   District of   California  , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841, 846 | Possession with Intent to Distribute Controlled Substances and Conspiracy |

The application is based on these facts:
See attached Affidavit of DEA Task Force Agent Phillip D'Ribeaux

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Phillip D'Ribeaux*
Applicant's signature

Phillip D'Ribeaux, DEA Task Force Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
  telephone   *(specify reliable electronic means)*.

Date:  10/1/2020

*[Judge's signature]*
Judge's signature

City and state:  San Diego, California            Hon. Karen S. Crawford, U.S. Magistrate Judge
Printed name and title

# AFFIDAVIT

I, Phillip D'Ribeaux, DEA Task Force Agent, having been duly sworn, declare and state as follows

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices:

    (1)    Android TCL Cellphone
              IMEI: 015416001598029
              ("**Target Device 1 or TD1**")

    (2)    Sky Devices Cellphone
              IMEI: 352083110405040
              ("**Target Device 2 or TD2**")
              (hereinafter referred to as **"Target Devices"**)

as further described in Attachments A-1 and A-2, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 841 and 846, as further described in Attachment B. The requested warrants relate to the investigation and prosecution of Jose Antonio Valencia (Valencia) and Esteban Ramirez-Salinas (Ramirez) for possession with the intent to distribute approximately 75.27 kilograms (165.94 pounds) of liquid methamphetamine in S.D. Cal. Crim. Case No. 20cr2297-LAB. The **Target Devices** are currently stored as evidence with the Drug Enforcement Administration (DEA) and located at 2425 La Brucherie Road, Imperial, CA 92251.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all the information known by me or other agents regarding this investigation, but only sets forth those facts believed to be necessary to establish probable cause. All dates and times

described are approximate, and refer to Pacific Standard Time (PST) unless otherwise specified.

## BACKGROUND

3.  I am employed as a United States Border Patrol Agent (Intelligence), and currently assigned as a Task Force Agent ("TFA") with the DEA, and have so been employed since March 2008. As a DEA TFA, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516. During my time as a United States Border Patrol Agent, I have been assigned to the El Centro Sector, in Imperial, California and worked checkpoint operations for the United States Border Patrol ("USBP") checkpoints located on State Route 2 in the Imperial County, California.

4.  I have conducted Intelligence duties since April 2011 and am familiar with the means that narcotic traffickers use in order to conceal their narcotics and narcotics proceeds. I have participated in numerous seizures of narcotics while working as a United States Border Patrol Agent. Based on my previous training and experience as a United States Border Patrol Agent, as well as my training and experience as a DEA TFA, I am familiar with methods utilized by drug traffickers, particularly Mexican drug trafficking organizations, to further their drug trafficking operations in importing narcotics into the United States, distributing narcotics within the United States, laundering narcotics proceeds, and smuggling bulk-cash from the United States back into Mexico.

5.  I have participated in investigating various drug trafficking organizations that are involved in the acquisition, importation, transportation, and distribution of controlled substances into and through the Southern District of California. I am familiar with and have used many of the traditional methods of investigation, including, visual surveillance, informant and witness interviews, defendant debriefings, undercover operations, and the seizure of drug evidence. I have spoken with other agents with extensive experience in narcotics smuggling investigations in the Southern District of California.

6.     I have arrested or participated in the arrest of numerous persons for violations of the Controlled Substances Act. In these cases, I have conducted interviews with the arrested persons and their associates, as well as cooperating individuals and informants. I have conducted surveillance of narcotics smugglers as they conduct their smuggling activity while crossing the border from Mexico into the United States, and while operating inside the United States. Through these investigative activities, I have gained a working knowledge and insight into the typical activity of narcotics smugglers, and the structure of their narcotics smuggling networks. I have also gained information as to the normal operational habits of persons who make their living as narcotics smugglers.

7.     Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of hard narcotics, such as cocaine and methamphetamine. Typically, load drivers smuggling narcotics across the border from Mexico into the United States are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substances. Narcotics smugglers and their organizations use cellular telephones, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of calls placed to and from cellular telephones.

8.     I am familiar with narcotics traffickers' methods of operation including the distribution, storage, and transportation of narcotics and the collection of money proceeds of narcotics trafficking and methods of money laundering used to conceal the nature of the proceeds. I have had training in investigations regarding the unlawful distribution and possession of controlled substances, as well as conspiracies associated with criminal narcotics, in violation of Title 21, United States Code, Sections 841 and 846.

9. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

10. Based upon my training, experience, and consultations with law enforcement officers experienced in controlled substances trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug traffickers and their co-conspirators will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b. Drug traffickers and their co-conspirators will use cellular/mobile telephones to negotiate the price, type, and quantity of drugs being sold to customers, and received from suppliers.

    c. Drug traffickers and their co-conspirators will use cellular/mobile telephones to arrange times and places to meet with customers to deliver illegal drugs, and to arrange times and places to meet with suppliers to receive illegal drugs.

    d. Drug traffickers and their co-conspirators will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as ongoing enforcement operations in their area.

    e. Drug traffickers and their co-conspirators will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

    f. Drug traffickers and their co-conspirators often use cellular/mobile telephones to record money owed to customers and suppliers and as evidence of past orders received and/or delivered.

g. The use of cellular telephones and other mobile communication devices by conspirators or drug traffickers tends to generate evidence that is stored on the device, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, based upon my training, education, and experience investigating these conspiracies, I have learned that searches of cellular/mobile telephones and/or other mobile communication devices yields evidence:

a. tending to identify co-conspirators that possess with the intent to distribute methamphetamine, or some other federally controlled substance;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of and/or the possession with the intent to distribute methamphetamine, or some other federally controlled substance within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of and/or the possession with intent to distribute methamphetamine, or some other federally controlled substance;

d. tending to identify travel to or presence at locations involved in the distribution of or possession with intent to distribute methamphetamine, or some other federally controlled substance, including stash houses, residences used to prepare or process controlled substances, and/or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

12. On July 7, 2020, at approximately 11:45 a.m., Valencia (driver; United States citizen) and Ramirez (passenger; citizen of Mexico), approached the United States Border Patrol (USBP) Highway 86 checkpoint in Westmorland, California. Defendants were in a green Ford-F250 pickup truck. While at primary inspection, a USBP agent asked for defendant's identification and Valencia stated that his wallet had been stolen and that he had no additional identification.

13. While defendants were speaking with the USBP agent at primary, a Human Narcotics Detection Dog (HNDD) alerted to the vehicle. The vehicle was referred to secondary inspection.

14. While in secondary inspection, agents questioned Ramirez as to his citizenship; ultimately, Ramirez admitted to being illegally present in the United States. Agents also instructed Valencia to park the green Ford F-250 in one of designated spots. Valencia further stated that he was coming from Mexicali and was headed to his home in Maderia, California. During Valencia's encounter with USBP, agents noticed that he was sweating profusely and had a towel used to clean the sweat off his hands. Valencia further stated that Ramirez was his roommate. Valencia consented to a search of the truck.

15. The canine alerted to the driver side center console while searching the vehicle in secondary inspection. The canine also gave a head flash when passing by the gas tank area as well.

16. Agents were able to see anomalies in the gas tank using a scope. The truck was driven behind the checkpoint for further inspections.

17. Using the scope again, agents were able to see a blue layer and murky brown

layer in the gas tank. After agents removed the scope from the gas tank, the excess gas on the scope changed into a white crystal like substance as it air-dried. The substance tested positive for the derivatives of methamphetamine, a schedule II controlled substance, and had an approximate weight of 75.27 kilograms (165.94 pounds).

18. Valencia and Ramirez were placed under arrest and USBP agents seized the **Target Devices**.

19. During an interview, Valencia was shown **TD1** and identified **TD1** as belonging to him. Valencia was read his *Miranda* rights, and he agreed to speak to agents. Valencia stated that he was instructed by a male individual to drive the truck to Mexicali and leave it at a hotel. Valencia stated that after a few days he went back to Mexicali and picked up the truck from the male individual. Valencia stated that the male individual told him to only put fuel in the front gas tank. Valencia stated that when he crossed into the United States, the male individual kept on calling him asking if he had crossed the checkpoint. Valencia stated he was instructed to drop off the truck at a gas station on Shaw Avenue in Fresno, California.

20. During an interview, Ramirez was shown **TD2** and identified **TD2** as belonging to him. Ramirez was read his *Miranda* rights, and he agreed to speak to agents. Ramirez denied knowledge of the narcotics and stated that he was accompanying his friend on a trip.

21. Based upon my experience and training, consultation with other law enforcement officers experienced in controlled substances trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that the Defendants were using the **Target Devices** to communicate with others to further the importation of controlled substances into the United States. Further, in my training and experience, controlled substances traffickers may be involved in the planning and coordination of a

drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the controlled substances. Based on my training and experience, it is also not unusual for individuals, such as Defendants, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on June 7, 2020, up to and including July 7, 2020.

## METHODOLOGY

22. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the

results using digital photography. This process is time and labor intensive and may take weeks or longer.

23. Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the telephone(s) and memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

24. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

25. Law enforcement officers performed a manual search of **TD1**, per Valencia's consent, and **TD2**, per Ramirez's consent, at the Highway 86 checkpoint on July 7, 2020. However, no information obtained from those searches of the **Target Devices** is being offered to support probable cause in this application. Nor has any information seen in the review of the **Target Devices** informed the decision to seek applications for both warrants. Because Valencia and Ramirez may proceed to trial, and consistent with a general practice of securing warrants for electronic devices seized at the time of arrest, we are seeking warrants to search the **Target Devices**.

//
//
//
//
//
//
//
//

## CONCLUSION

26.     Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Devices** will yield evidence of Defendants violations of Title 21, United States Code, Sections 841 and 846. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachments A-1 and A-2 and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____*Phillip D'Ribeaux*_____
Phillip D'Ribeaux, DEA Task Force Agent
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __1st__ day of October, 2020.

_____
HON. KAREN S. CRAWFORD
United States Magistrate Judge

10

## **ATTACHMENT A-2**

PROPERTY TO BE SEARCHED

The following property is to be searched:

    (2)    Sky Devices Cellphone
            IMEI: 352083110405040
            ("**Target Device 2 or TD2**")

**TD2** is currently securely stored at Drug Enforcement Administration and located at 2425 La Brucherie Road, Imperial, CA 92251.

## **ATTACHMENT B**

### ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachments A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of <u>June 7, 2020, up to and including July 7, 2020</u>.

a. tending to identify co-conspirators that possess with the intent to distribute methamphetamine, or some other federally controlled substance;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of and/or the possession with the intent to distribute methamphetamine, or some other federally controlled substance within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of and/or the possession with intent to distribute methamphetamine, or some other federally controlled substance;

d. tending to identify travel to or presence at locations involved in the distribution of or possession with intent to distribute methamphetamine, or some other federally controlled substance, including stash houses, residences used to prepare or process controlled substances, and/or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of Title 21, United States Code, Sections 841 and 846.